# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00687-CR

---

**Delfino Gonzalez, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NO. CR2017-354, THE HONORABLE GARY L. STEEL, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Delfino Gonzalez was convicted by a jury on ten counts of the third-degree felony offense of forgery. *See* Tex. Penal Code § 32.21(e). The district court assessed punishment, enhanced under the habitual-offender provision of the Texas Penal Code, at forty years' imprisonment for each count with the sentences running concurrently. *See id*. § 12.42(d). In four issues on appeal, Gonzalez contends that the evidence was legally insufficient to support his conviction of forgery on all counts, that the district court abused its discretion by denying his motion for continuance of the punishment phase of trial, and that he received ineffective assistance of counsel at trial. We will affirm the district court's judgment of conviction.

## BACKGROUND

On October 22, 2015, police officers Leslie Bettice and Sherry Powell were dispatched to 2762 Heynis North in New Braunfels. Officer Bettice met with Javier Nieto, an

employee of New Braunfels Utilities ("NBU"), who was responding to a call for water service at this address. Nieto testified that when he arrived, he discovered what appeared to be a theft of water service. He testified that he saw a fire hydrant with a water hose running from the fire hydrant to the residence. He retrieved the fire hydrant meter and determined from NBU records that the meter was from a different area of New Braunfels. Further, according to NBU records, the residence was vacant. Nieto saw that the water meter for the residence was turned off, indicating that NBU had previously shut off the water at that address. While there, he saw a car driving back and forth multiple times before parking near the residence. Nieto called police after he saw someone getting out of the car and walking to the residence while carrying a tool to enter the home.

The two officers on the scene approached the residence. Officer Bettice went to the back of the residence, and Officer Powell went to the front door. Officer Bettice found the back door cracked open several inches, and she was able to see a man standing at the foot of a bed. Officer Bettice's body microphone recorded her saying hello, announcing that she is with the police department, and asking someone—later identified as Gonzalez—if he is supposed to be there and who else lives there. Then Officer Bettice told the man that police were there because NBU reported that the water was cut off at that address and that somebody had been stealing from the fire hydrant. Officer Bettice testified that Gonzalez stated that he was there to help a resident of the house and that he admitted hooking up a water hose to the hydrant.

On the recording, Officer Bettice asked if she could make sure that no one else was in the house, and Gonzalez told her to "go ahead." Next, she asked him, "Is this your wallet in here? Brown wallet? That's yours?" She then directed Officer Kyle Williams, who had arrived at the scene, to detain the man and stated, "The wallet that you just said is yours has a

2

baggie and a straw hanging out of it."[1]  Officer Bettice also asked, "How much cash do you have in here?" and "What do you have $710 for?"  The man responded about doing a "remodeling job."  She then asked, "How long ago did you use?"  He replied, "It's been a little while" and mentioned that he "just got off parole."

After Officer Bettice directed Officer Williams to detain Gonzalez, Officer Williams conducted a consensual search of Gonzalez's person.  Officer Williams testified that during the search, he found a checkbook on Gonzalez's person with money that did not appear to be authentic currency.  Officer Williams further testified that Gonzalez said that he received the counterfeit currency as payment for an odd job and that "the payer of the currency had provided him with basically overpayment in the form of fictitious currency, knowing that it was fraudulent."

According to Officer Williams, the counterfeit currency was found in the checkbook mixed with real money.  The counterfeit currency was admitted into evidence, and Officer Williams opined that the bills were an "obvious forgery" to him, noting that their texture and color were "slightly different" from that of real money.  Officer Williams testified that people involved in narcotics consumption are typically involved in other crimes such as assault, theft, and fraud, and that narcotics consumption and the crime of forgery or possession of fraudulent currency "also goes hand in hand."

On the audio recording from the scene, Officer Williams began discussing the discovery of the counterfeit money with Officer Bettice: "So I'm thinking on the counterfeit stuff, can we—"  Officer Bettice interjected, "Well, we can't take him on the counterfeit because

---

[1]  During trial, Officer Bettice testified that the straw was consistent with an item used to consume narcotics and that she suspected the substance in the baggie was methamphetamine.

3

he's not passing it.  But we can take him on the dope."  She proceeded to call Detective Rick Sanchez and then Detective James Moore of the narcotics task force, each time summarizing what occurred that morning.

In the call to Detective Sanchez, Officer Bettice mentioned that Gonzalez had just gotten out of prison and had "ice" and counterfeit money:

> His name is Delfino Gonzalez and he's from San Antonio.  He says that he just got out of prison, he's tatted from head to toe.  While we've been talking to him, he's got a tenth of a gram of ice on him.  He's got probably $700 cash and probably about another $500 in counterfeit money.  And he says that he is living here with his girlfriend, her name is [M.V.M.].

Later during the recording, Officer Bettice spoke with Gonzalez and asked, "So where'd the counterfeit cash come from?"  Officer Williams responded, "He's a plumber, he went to go hook up utilities.  They were owing him two hundred bucks, they gave him like seven.  They paid him in counterfeit bills."  Gonzalez then stated, "That's why I had it separate from the real money I had."  Officer Bettice asked, "So it came from the same people who paid you the good money, though?"  Gonzalez said, "No."

After Gonzalez's arrest, Detective Moore prepared an offense report for this case.  His offense report, admitted into evidence, noted that $680 was found in a "brown 'checkbook' style keeper," consisting of six $100 bills and four $20 bills in United States currency, all of which appeared to be counterfeit.

During the trial the State introduced a DVD containing the video and audio recording, which was admitted into evidence during the guilt-innocence phase.  The DVD was not published to the jury, but they were encouraged to listen to it.  The court told the jury before

4

their deliberations that they would have the DVD and a way to play it "if they wanted to look at it and see what was actually said."[2]

When the evidence closed, defense counsel moved for a directed verdict, arguing that the State had not proved intent to defraud and intent to pass. The district court denied that motion. The jury found Gonzalez guilty on all ten counts of forgery, and the case was then reset for a punishment hearing before the court. Judge Jack Robison presided over the guilt-innocence phase, while Judge Gary Steel presided over the punishment phase.

On the day of the punishment hearing, Gonzalez requested a thirty-day continuance "to see if Judge Robison is going to be back." The motion was denied. At the conclusion of the hearing, Judge Steel assessed Gonzalez's punishment at forty years' imprisonment on each of the forgery counts with the sentences running concurrently. Gonzalez filed a motion for new trial that was denied by operation of law. This appeal followed.

## DISCUSSION

Gonzalez challenges the sufficiency of the evidence supporting his conviction.

**Standard of Review**

Due process requires that the State prove beyond a reasonable doubt every fact necessary to constitute the crime with which the defendant is charged. *Jackson v. Virginia*, 443 U.S. 307, 314 (1979). Under a legal-sufficiency standard of review, we consider all the evidence in the light most favorable to the verdict and determine whether "*any* rational trier of fact could

---

[2] The audio consists primarily of Officer Bettice's voice, but voices of others near her are sometimes captured on the recording as well. The audio from Officer Bettice's body microphone is paired with patrol-car video from the scene, depicting the street and driveway views where the patrol car was parked. The video does not provide a body-camera view of events at the scene.

5

have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 318-19; *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). "Beyond a reasonable doubt, however, does not require the State to disprove every conceivable alternative to a defendant's guilt." *Ramsey v. State*, 473 S.W.3d 805, 809, 811 (Tex. Crim. App. 2015).

Jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony presented at trial. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018). We defer to the jury's resolution of conflicts in the evidence, weighing of the testimony, and drawing of reasonable inferences from basic facts to ultimate facts. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We apply the same standard to direct and circumstantial evidence. *Id.* Circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Nisbett*, 552 S.W.3d at 262. Each fact need not point directly and independently to the defendant's guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Id.* As an appellate court, our role "is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018).

Our legal-sufficiency review encompasses all evidence that the trier of fact was permitted to consider, regardless of whether such evidence was rightly or wrongly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Young v. State*, 591 S.W.3d 579, 587 (Tex. App.—Austin 2019, no pet.). "We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge." *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). A hypothetically correct jury charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of

6

proof or unnecessarily restrict the State's liability theories, and adequately describes the particular offense for which the defendant was tried. *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019). "'[A]uthorized by the indictment' means the statutory elements of the offense as modified by the charging instrument." *Id*. This standard applies to all trials and ensures that a judgment of acquittal is not based on mere jury-charge error but "is reserved for those situations in which there is an actual failure in the State's proof of the crime" at trial. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

**Sufficient Evidence Supports Forgery Conviction**

Gonzalez's forgery indictment alleged a separate count for each counterfeit bill. Counts I through VI addressed the six $100 bills and alleged that Gonzalez

> with intent to defraud or harm another, did then and there intentionally or knowingly possess a writing that had been forged with intent to issue, transfer, pass, publish, otherwise utter said writing and said writing purported to be part of an issue of money, to-wit: a one hundred dollar bill of the tenor following:
>
> [image of each counterfeit $100 bill]

Counts VII through X of the indictment made the same allegations as to the four $20 bills and included images of each of them. Thus, a forgery conviction on the indictment in this case required proof beyond a reasonable doubt that Gonzalez: (1) with intent to defraud or harm another; (2) did then and there intentionally or knowingly possess a writing (counterfeit bills) that had been forged; (3) with intent to issue, transfer, pass, publish, or otherwise utter said writing; and (4) that said writing purported to be part of an issue of money. *See* Tex. Penal Code § 32.21(a)(1)(B), (C), (2)(B), (b), (e)(1).

7

Gonzalez challenges the sufficiency of the evidence at trial supporting the element of "intent to defraud or harm another" and the element of "intent to issue, transfer, pass, publish, or otherwise utter" the writing. *See id*. § 32.21(a)(1)(B), (C), (b).

### a. Intent to Defraud Another

"When intent to defraud is the mens rea of the offense, the State must prove facts from which that intent is deducible beyond a reasonable doubt and, in the absence of that proof, a conviction will not be justified." *Okonkwo v. State*, 398 S.W.3d 689, 695 (Tex. Crim. App. 2003) (citing *Stuebgen v. State*, 547 S.W.2d 29, 32 (Tex. Crim. App. 1977)). If the State proves that the defendant had knowledge that a particular writing was forged, proof of the defendant's intent to defraud may be inferred and established by circumstantial evidence. *Id*. at 701 n.16 (Cochran, J., concurring) (noting that "in forgery, the culpable mental state of intent to harm or defraud requires proof of knowledge that the check is forged, but if the State proves that an actor has knowledge that a particular check is forged, proof of intent to defraud is inferred, and both knowledge and intent to defraud may be established with circumstantial evidence" (quoting *Williams v. State*, 688 S.W.2d 486, 488-90 (Tex. Crim. App. 1985))); *see Bowers v. State*, No. 11-17-00256-CR, 2019 Tex. App. LEXIS 8472, at *6-7 (Tex. App.—Eastland Sept. 19, 2019, no pet.) (mem. op., not designated for publication) (same). But intent to defraud cannot be inferred from mere evidence of possession or passing of a forged instrument. *De La Paz v. State*, 279 S.W.3d 336, 350 n.46 (Tex. Crim. App. 2009) ("This Court has wisely held that intent or guilty knowledge cannot be inferred from the mere passing of a forged instrument. Indeed, to hold otherwise would create the danger that the unknowing and accidental passing of a forged instrument could effectively become a strict liability offense."); *Verner v. State*, 35 S.W.2d 428,

8

429 (Tex. 1931) ("[M]ere possession of an instrument amounts to nothing unless the other essential elements be established, to-wit, the forgery and knowledge on the part of the possessor."); *Johnson v. State*, 425 S.W.3d 516, 520 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) ("Possession, passage, or presentment of a forged instrument is not evidence of intent to defraud."); *see also Booth v. State*, No. 11-17-00278-CR, 2019 Tex. App. LEXIS 8476, at *9 (Tex. App.—Eastland Sept. 19, 2019, no pet.) (mem. op., not designated for publication) (same).

Here, the jury heard testimony that Gonzalez knew the $20 and $100 bills were counterfeit. His knowing possession of the counterfeit bills allowed the jury to infer that he intended to defraud another, which could be established by the circumstantial evidence presented at trial. *See Okonkwo*, 398 S.W.3d at 701 n.16. A rational jury could have found that Gonzalez intended to defraud or harm someone because he accepted "overpayment" in false currency for an odd job, the checkbook containing counterfeit money was found on his person when he returned to the house, and he had counterfeit money mixed with real money in the checkbook. Officer Williams testified that Gonzalez told him that "the payer of the currency had provided [Gonzalez] with basically overpayment in the form of fictitious currency, knowing that it was fraudulent." When Officer Williams told Officer Bettice that Gonzalez was overpaid in counterfeit bills, Gonzalez acknowledged it by stating, "That's why I had it separate from the real money I had." Gonzalez was "tweaked out" and had narcotics and a straw in his wallet when police found him, and Officer Williams testified that narcotics consumption and the crime of forgery or possession of fraudulent currency go "hand in hand." A rational jury could have found beyond a reasonable doubt that Gonzalez intended to defraud another based on the evidence that he received extra payment for an odd job because it was counterfeit money, he had it on his person, and the counterfeit money was mixed with real money.

9

### b. Intent to Pass

The element of possession of counterfeit money with "intent to issue, transfer, pass, publish, or otherwise utter" may also be proven by circumstantial evidence. *Shipp v. State*, 292 S.W.3d 262, 267 (Tex. App.—Texarkana 2009, no pet.) ("just as intent to harm or defraud can be proven by circumstantial evidence, intent to utter can be proved in the same manner"); *see also Booth*, 2019 Tex. App. LEXIS 8476, at *9 (noting that although "[t]his is not the type of counterfeit case where there is direct evidence that a defendant attempted to pass counterfeit bill to another person or business. . . direct evidence and circumstantial evidence are equally probative"). When considering whether a defendant possessed counterfeit bills with intent to pass them, Texas courts have considered factors such as the manner in which the counterfeit bills were packaged, the number of counterfeit bills that the defendant possessed, and whether there was evidence that anyone else possessed counterfeit money. *See, e.g.*, *Booth*, 2019 Tex. App. LEXIS 8476, at *9, *11 (noting that defendant "did not possess one or two counterfeit $20 bills, he possessed thirty of them—$600 worth" and that "there was no evidence presented that anyone else in the vehicle possessed counterfeit money"); *Bowers*, 2019 Tex. App. LEXIS 8472, at *2-3, *6 (defendant packaged counterfeit bills and genuine cash into rubberbanded bundle with "a wad of newspapers and stuff inside" to look like more money and admitted knowing that counterfeit money he received was "bad"); *see also Shipp*, 292 S.W.3d at 267 (concluding that there was ample evidence of intent to harm or defraud and that "the same evidence is ample evidence of intent to utter").

Here, the evidence showed that Gonzalez possessed ten counterfeit bills. Those bills were kept in a checkbook that was found on Gonzalez's person. There was no evidence indicating that anyone else in the house where Gonzalez was staying possessed counterfeit

10

money. Gonzalez acknowledged that he kept the counterfeit money "separate from the real money [he] had." Based on the evidence at trial, a rational jury could have found beyond a reasonable doubt that Gonzalez knew he had ten counterfeit bills, that the counterfeit bills were mixed in a checkbook with real money, and that he carried the counterfeit bills on his person while away from the residence where he was staying because he intended to pass them to another.

Having determined that sufficient evidence supported both challenged elements of "intent to defraud or harm another" and "intent to issue, transfer, pass, publish, or otherwise utter" the writing, we conclude that the evidence was sufficient to support Gonzalez's conviction of forgery by possession with intent to pass. *See* Tex. Penal Code § 32.21(c), (e). We overrule Gonzalez's first issue.

**Denial of Motion for Continuance**

Next, Gonzalez contends that the district court abused its discretion by denying his oral motion for continuance of the punishment phase of trial. Gonzalez notes that he was sentenced by a judge who was not present during the guilt-innocence phase and was not the judge presiding when Gonzalez decided to have the district court assess his punishment.

However, the Code of Criminal Procedure requires that motions for continuance be in writing and sworn. Tex. Code Crim. Proc. arts. 29.03 ("A criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion."), .08 ("All motions for continuance must be sworn to by a person having personal knowledge of the facts relied on for the continuance."). Motions for continuance that are not in writing and not sworn preserve nothing for review.

11

*Dewberry v. State*, 4 S.W.3d 735, 756 (Tex. Crim. App. 1999); *see Fennessey-Underwood v. State*, No. 03-15-00087-CR, 2017 Tex. App. LEXIS 3464, at *2 (Tex. App.—Austin Apr. 20, 2017, no pet.) (mem. op., not designated for publication) ("A sworn and written motion is required to preserve an appellate complaint about the denial of a motion for a continuance."). Thus, when a party makes an unsworn, oral motion for continuance that a trial judge denies, the party forfeits its right to complain on appeal about the judge's ruling. *Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012).

Here, when Judge Steel called the case and announced that he would preside over the punishment hearing, Gonzalez sought to postpone the hearing for thirty days:

Court:    Okay.  I called you up here because this thing has been punted down the road—is my understanding—and that we're kind of waiting for Judge Robison.  Without saying too much, I don't think we can wait any longer so I'm ready to take it on.

[Defense]: Okay.

. . . .

Court:    What else do you have?

[Defense]: Mr. Gonzalez on your sentencing docket.  He asked if we might get 30 days more to see if Judge Robison is going to be back and I explained to him that I don't think that—

Court:    That's denied.  Tell him to get ready for punishment.

[Defense]: Will do, Judge.

. . . .

Court:    We'll do it this afternoon.  That won't be a problem.  But tell him that's denied.  You might want to explain to him, number one, we don't know when Judge Robison is coming back.  Number two, I've been a sitting judge for 20 years, almost as long as Judge Robison; that I have jurisdiction to take this case; and I have taken the position, as

12

well as the rest of the judges in Comal County, that we're not going to let people sit in our jail waiting for Judge Robison when we do not have a set date of when he's coming back.

[Defense]: I understand, Judge. I will confer with Mr. Gonzalez.

During the punishment hearing, Judge Steel stated that he had "read the PSI" and that Judge Robison had a medical issue involving an extended absence:

Court:     Mr. [defense counsel], if you object—and you may also give a synopsis of the trial. I did not sit on the jury trial. And so the record is clear, this was done by Judge Robison who is in a recuperation— recuperation phase from a medical [sic] who may or may not be back for several months. And so I have clear jurisdiction to do it, but I didn't try the case. I'm going to ask both of you to hit whatever you think was important from the case. If you have a different scenario, object and then I will give you an opportunity in your opening to tell me what you thought or how it was misrepresented.

The oral motion is the only motion for continuance that Gonzalez presented to the district court. No written and sworn motion for continuance of the punishment hearing is in the record. Because Gonzalez failed to comply with the statutory requirements for motions for continuance, he has not preserved this complaint for our review. *See* Tex. Code Crim. Proc. arts. 29.03, .08; *Blackshear*, 385 S.W.3d at 591; *Dewberry*, 4 S.W.3d at 756; *Fennessey-Underwood*, 2017 Tex. App. LEXIS 3464, at *2.

**Ineffective Assistance of Counsel**

In his last two issues, Gonzalez contends that he received ineffective assistance of counsel because his counsel made an oral motion for continuance of the punishment hearing, instead of a written and sworn motion, and because his counsel failed to object to, or request

13

redaction of, the audio-recording references to Gonzalez's criminal history. As we have noted, the recording states that Gonzalez "just got off parole" and "just got out of prison."

To prevail on a claim of ineffective assistance of counsel, appellant must prove by a preponderance of the evidence that counsel's performance fell below the standard of prevailing professional norms and but for counsel's deficiency, there is a reasonable probability that the result of the trial would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Thompson*, 9 S.W.3d at 813. Our review of counsel's representation is highly deferential, and counsel is afforded a "strong presumption" that his conduct fell within the wide range of reasonable professional assistance. *Ex parte Lewis*, 537 S.W.3d 917, 921 (Tex. Crim. App. 2017); *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

To defeat this presumption, allegations of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017). The record on direct appeal is generally insufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision making as to overcome the presumption that counsel's conduct was reasonable and professional. *Id.* Further, trial counsel should generally be afforded an opportunity to explain his actions before being found ineffective. *Id.* "In the face of an undeveloped record, counsel should be found ineffective only if his conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

Here, even if Gonzalez had preserved his complaint about the denial of his motion for continuance, he could not have shown reversible error. Generally, "the determination of whether to grant a continuance lies with the sound discretion of the court[,]"*Collier v. Poe*, 732 S.W.2d 332, 334 (Tex. Crim. App. 1987), and denial of a continuance is reversible only for abuse of that discretion, *Matamoros v. State*, 901 S.W.2d 470, 478 (Tex. Crim. App. 1995). Although the better practice would have been for Judge Robison to preside over the punishment phase since he had presided over the guilt-innocence phase, Judge Steel did not abuse his discretion by denying the requested continuance because of the uncertainty of Judge Robison's availability pending his medical recuperation. *See Webb v. State*, 755 S.W.2d 222, 224 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd); *cf. id*. at 225 (Smith, J., dissenting) ("I recognize that there will be cases where it is impossible or impractical to have the judge who presided at guilt-innocence stage to assess punishment. This will occur when the judge has died, become incapacitated, left office, or is unavailable for a lengthy period of time. None of these events occurred in this case, and no evidence indicates that Judge Price was not ready, willing, and able to assess punishment and thus fulfill the reasonable expectations that were created when he presided over the guilt-innocence stage of the trial."). On this record, we conclude that the district court's ruling on the motion for continuance would not have been different or an abuse of discretion if defense counsel had filed a written and sworn motion.[3]

As to the admission of the criminal-history references on the audio recording, defense counsel has not been afforded an opportunity to explain his actions. *See Prine*, 537

---

[3] Moreover, when Judge Steel offered a two-week continuance of the punishment hearing so that Gonzalez could review a video allegedly containing admissions that Gonzalez made about his gang membership, defense counsel stated—after conferring with Gonzalez—that Gonzalez "prefer[red] to just do it today."

15

S.W.3d at 117. Without affording him that opportunity, we cannot say that Gonzalez has shown on this record that his counsel's representation was so deficient and so lacking in tactical or strategic decision making as to overcome the strong presumption that his conduct was reasonable and professional.[4] *See id*.; *Lewis*, 537 S.W.3d at 921; *Bone*, 77 S.W.3d at 833; *see also Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) (noting that defendant's "failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong"). Accordingly, we overrule Gonzalez's third and fourth issues complaining that he received ineffective assistance of counsel.

---

[4] Ineffective-assistance-of-counsel claims are generally unsuccessful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus. *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). Unlike other claims rejected on direct appeal, ineffective-assistance-of-counsel claims rejected due to lack of adequate information may be reconsidered on an application for a writ of habeas corpus. *Id*.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Triana and Smith

Affirmed

Filed:   April 17, 2020

Do Not Publish